# In the United States Court of Federal Claims

Case No. 10-819C
(**FILED:** March 18, 2011)
**TO BE PUBLISHED**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * <br> CREWZERS FIRE CREW <br> TRANSPORT, INCORPORATED, <br> *Plaintiff,* <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br> *Defendant* <br><br> * * * * * * * * * * * * * * * * * * * * * * * | * Pre-Award Bid Protest; Tucker Act, <br> * 28 U.S.C. § 1491(b)(1); Simplified <br> * Acquisition Procedures, 41 U.S.C. <br> * § 253(g); Blanket Purchase <br> * Agreements; Illusory Contract; <br> * Option Contract; Use of Agency <br> * Cooperator (Local Government <br> * Entities) in Lieu of Private Contractor; <br> * Stafford Act, 42 U.S.C. § 5150(a)(1); <br> * Federal Grant and Cooperative <br> * Agreement Act, 31 U.S.C. § 6303(1); <br> * Waiver of Untimely Argument. |

*Cyrus E. Phillips, IV*, Arlington, VA, for Plaintiff.

*Armando A. Rodriguez-Feo*, U.S. Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, Commercial Litigation Division; and *Deborah A. Bynum*, Assistant Director.  *Azine Farzami*, U.S. Department of Agriculture, Washington D.C., Of-Counsel.

*John Bergen*, Law Clerk.

## OPINION

**BASKIR, Judge.**

      This pre-award bid protest case arises out of a nationwide procurement undertaken by the U.S. Forest Service (Forest Service), establishing regionally based Blanket Purchase Agreements (BPAs) with various vendors for the purchase order of crew carrier buses to be used in responding to forest fires and other emergencies.

      The parties have filed cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the U.S. Court of Federal Claims (RCFC).  Additionally, plaintiff, Crewzers Fire Crew Transport, Incorporated (Crewzers), has filed a motion to enjoin the Forest Service from awarding the proffered BPAs, asserting that the solicitation creates illusory agreements.

For the reasons given below, the defendant's motion for judgment on the administrative record is **GRANTED**. The plaintiff's motion for judgment on the administrative record and its request for injunctive relief are hereby **DENIED**.

## BACKGROUND

The following summary provides background information on the procurement and various administrative and procedural challenges pursued to date by Crewzers. The information is gleaned directly from the administrative record filed in this case on December 28, 2010. On February 28, 2011, the parties filed a Consolidated Statement of Facts (CSF) summarizing those portions of the administrative records upon which they have relied in their briefs.

**I.    Summary of Acquisition**

On December 9, 2009, the Forest Service issued Solicitation AG-024B-S-10-7000 (the solicitation), a National Interagency Fire Center Acquisition to obtain multiple nationwide Preseason Incident BPAs. Administrative Record (AR) 1. The Forest Service intended to rely upon the resulting BPAs in order to place orders for crew carrier buses for local, regional, and nationwide wildfire suppression, as well as for "all-hazard incidents," including various threats and hazards, both natural and human-caused. AR 12.

The crew carrier buses contemplated by this procurement are school bus-type vehicles that have been modified to accommodate a 22-person crew and its equipment, up to 5,300 pounds. The operator of this vehicle will require advanced training and the bus will be equipped for use on off-road conditions, unimproved roads, or highways, "in mountainous, rangeland and timbered areas." CSF ¶ 14; *see also* Declaration of Pilgrim Guinn (Guinn Decl.) with attachments. According to the plaintiff, the costs to purchase and retro-fit a school bus for this purpose could range from $30,000 to $40,000, and up to $250,000 in expenses associated with repairing the entire fleet of buses after the fire season. Guinn Decl. at ¶ 7.

The agency chose to satisfy its needs through a Simplified Acquisition Procedure requesting from interested vendors firm fixed-price quotations for the buses. Interested vendors were required to submit their quotations online through the Virtual Incident Procurement (VIPR) system. AR 445. The BPAs were awarded on the basis of a "cascading set-aside procedure," whereby preference would be given to eligible HUBZone small business concerns and Service Disabled Veteran Owned Small Business concerns, and then to other responsible small business concerns. Solicitation § B (Method of Award). Orders issued against awarded BPAs were to be made using the same order of preference.

The Forest Service desired to establish multiple BPAs for each of a number of Host Dispatch Zones or Geographical Area Coordination Centers. AR 5. In the event of forest fire or all-hazard incident, the dispatcher for the affected Host Dispatch Zone

would place an order against one or more of the BPAs, in accordance with the ordering protocol, or Dispatch Priority List (DPL).  AR 17.  Under the Solicitation, BPAs are issued on a lowest-price basis.  The DPLs give priority first to HUBZone small business concerns, pursuant to 15 U.S.C. § 657a, with the lowest evaluated price from such an entity to be ranked highest on the DPL.  In the event there are insufficient HUBZone vendors to meet the anticipated need, then orders are placed from small business concerns, generally, which are likewise ranked by the DPL on the basis of price.  AR 1; 6-7; 16.

Orders placed against the BPA were limited to $150,000.  AR 6; *but see* Contracting Officer's Statement, GAO Protest B.402530 and B.402530.2 ("The dollar limitation for any individual order is $100,000").  The BPAs remain in effect for three years, although the BPA holders have an opportunity each year to adjust their quoted prices.  AR 10.  Although the anticipated need for crew carrier buses is between February and November of each year, orders may be made against the BPA at any time during the year.  AR 10.

In order to ensure availability of resources, the Forest Service required the BPA holders to dedicate their proposed equipment to a particular host dispatch zone and notify the dispatch center of the availability of each crew carrier bus located in the zone.  The buses are subject to inspection by the agency at the time of hire and prior to passenger haul.  AR 15-16.  As with their prices, vendors were permitted to change their host dispatch zone one time each year during the three-year BPA.  AR 11-12.  Once dedicated, however, vehicles could not be swapped out of a particular host dispatch zone at will.  *See* AR 25 (Intermittent replacement of resources not allowed).  Those awarded BPAs were required in advance to provide a Vehicle Identification Number (VIN) for the particular zone or zones in which they intended to supply crew carrier buses.  AR 5.  Moreover, only one VIN could be used per zone, meaning the vendor was not permitted to move its fleet of crew carrier buses from region to region, based on where the need was expected to arise next.  As government counsel put it, the bus providers were prohibited from engaging in the practice of "fire-chasing."  Oral Argument, March 11, 2011 (Oral Arg.) at 11:40.  Accordingly, there was no prohibition against bidding for multiple geographical areas, "but upon acceptance of an offer of an award, all other offers for that resource category and/or type will be considered withdrawn."  AR 7.  Consequently, "[p]rospective offerors [were] cautioned to carefully consider the solicitations to which they respond."  *Id.*

## II. <u>Terms of Agreement</u>

In a section captioned Pricing and Estimated Quantity, the solicitation provides:

> Since the needs of the Government and availability of contractor's resources during an emergency cannot be determined in advance, it is mutually agreed that, upon request of the Government, the contractor shall furnish the resources listed herein to the extent the contractor is willing and able at the time of the order.  Due to the sporadic occurrence of Incident activity, the placement of any orders IS NOT GUARANTEED.

AR 6 (Emphasis in original). The passage renders the obligation of the Government conditional, at best, and that of the potential bus provider discretionary. The inherent uncertainty in the need for these resources – and the seemingly inconsistent promise that the contractor "shall" furnish the resources "if willing and able" – is echoed in other provisions in the solicitation. For instance, in Section C, Agreement and Performance Period, the solicitation reads: "Since the resource needs of the Government and availability of contractor's resources during an emergency cannot be determined in advance, it is mutually agreed that, upon request of the Government, the Contractor shall furnish the resources listed herein to the extent the Contractor is willing and able at the time of order." Solicitation, § C.3.1; AR 12.

Presumably, the vendors awarded BPAs under this solicitation are in no way compelled to respond to a request by the government in the event of a forest fire or all-hazard incident. The solicitation merely provides that they are "responsible for maintaining their current status by informing their host dispatch center of their availability," and "[w]hen contract resources are unavailable, the resources will not be eligible for dispatch under the Agreement." Solicitation § D ("Availability"); AR 17. There is no mention of breach of contract or even termination of the BPA due to the crew carrier bus vendor's unavailability.

The Forest Service's obligation to place an order from among the BPAs is further limited by the character of the incident and response. There are three exceptions to the ordering protocol established by the solicitation:

> (A) For "initial attack," defined as a "planned response to a wildfire given the wildfire's potential fire behavior," the objective of which is "to stop the spread of the wildfire and suppress it at least cost." The initial attack is further characterized by "[a]n aggressive suppression action that is consistent with firefighter and public safety." AR 29;
>
> (B) In recognition of Tribal preference policy applicable in certain reservation jurisdictions; and
>
> (C) Where fire conditions at the time of dispatch require deviation.

Solicitation, § D.6.1 (a)-(c); AR 17.

During the "initial attack" phase of the response, the solicitation provides that "dispatchers will follow the 'closest forces' concept and utilize locally available resources according to agency and incident needs." Solicitation, § D.6.1 (a). Furthermore, "[t]he priority dispatch ranking may not be used during initial attack and Contractor resources may or may not be used." *Id.* For all other incidents the normal priority rules remain in effect. *See* Solicitation § D.6.3.1 ("The Government intends to dispatch contractor resources based on this priority ranking for other than initial attack.") However, the third exception, in section D.6.1 (c), appears to give the Incident

Commander additional discretion, beyond the initial attack exception, to deviate from the DPL. That provision reads, in full:

> Government normally will dispatch resources in accordance with this protocol; however, the number of fire orders in process and actual fire conditions at the time of dispatch may require a deviation from normal procedures in order to respond effectively to such conditions. Any such deviation will be within the discretion of Government, and will not be deemed a violation of any term or condition of this Agreement.

Solicitation, § D.6.1 (c).

Finally, in addition to these explicit exceptions, the solicitation mandates more liberally, at the outset of the ordering protocol, that "[t]his Agreement does not preclude the Government from using any Agency or Agency Cooperator owned resources before resources are mobilized under this Agreement." Solicitation, § D.6. Thus the Forest Service is not bound by the BPA established under this solicitation, but if it chooses to use resources under the BPA, it must do so in accordance with the DPL. *See* Solicitation § D.6.1 ("Each host dispatch center will give dispatch priority to the resources offering the greatest advantage (*See* D.6.2) before all other private resources not under Agreement with the following exceptions ...").

### III.   Initial Challenges to the Procurement

On February 18, 2010, Crewzers filed a pre-award protest to the terms of the solicitation with the Government Accountability Office (GAO). AR 436-44. The protest was subsequently denied on the merits on May 17, 2010. AR 415-19. The allegations and resulting recommendation of GAO are unrelated to the issues presently before us.

Quotations were initially due on August 27, 2010. On that date, Crewzers filed a another protest with GAO. The gravamen of these allegations was that the Forest Service had exceeded its authority by placing certain restrictions upon the offerors. In particular, the plaintiff dissented to the notion that it could be locked in as to the vehicles it would use at various sites if, in fact, the BPA is not a contract. On November 9, 2010, the GAO dismissed the protest without addressing the merits, finding that the plaintiff had frustrated the protest process by raising allegations in a piecemeal fashion, thereby causing delay. AR 83-84. One week later, on November 16, 2010, the contracting officer announced via email message sent to all prospective bidders: "[D]ue to all of the delays surrounding this solicitation you are now authorized to make ANY changes to your quote," including prices, dispatch locations, and equipment. AR 72. With that announcement, the contracting officer set a new deadline of November 23, 2010, for the submission of revised quotes. *Id.*

This correspondence prompted yet another pre-award protest, this time an agency-level protest, challenging the solicitation's terms as illusory and unenforceable. AR 73-74. In its letter to the contracting officer, Crewzers contended "[i]f it is mandatory that each crew carrier be restricted to one (1) *host dispatch center* (arbitrary

- 5 -

geographical boundary) for three (3) years, then it is mandatory that the agency provide a return promise of payment for each crew carrier performance in doing so." AR 74. Without waiting for a response, Crewzers then submitted revised quotations for multiple crew carrier buses over the Forest Service's on-line VIPR System on November 23, 2010. AR 75-76. Contemporaneous with the submission of its revised quotation, Crewzers sent to the Clerk of Court, U.S. Court of Federal Claims, a pre-filing notice of its intention to file a bid protest. The plaintiff filed a Pre-Award Procurement Protest Complaint with the Court on November 30, 2010.

On December 22, 2010, the contracting officer advised offerors that a number of bid protests had been filed, that the closing date for receipt of quotations would again be adjusted, and that an award might be delayed until a decision is reached by the Court on this and other pending bid protests. AR 77-78. She then issued a decision formally denying the agency-level challenge to the solicitation's terms, which had since been overtaken by events. AR 81.

### IV.  Procedural History

The Court held a preliminary status conference on December 1, 2010, at which time it appeared as though the parties might settle this dispute with minor revisions to the language of the solicitation, to which the defendant appeared willing to agree. These efforts broke down apparently, and on December 11, 2010, the plaintiff amended its Complaint. In its Amended and Restated Pre-Award Procurement Protest Complaint ("Am. Compl."), Crewzers sets forth seven claims for relief, all related to the illusory nature of the promises underlying the BPAs sought under the solicitation. The plaintiff seeks:

> (1) a declaration that the defendant's proffered BPAs "are illusory and unenforceable, lack a reasonable basis, are unreasonable or irrational, and thus are arbitrary and capricious;"
>
> (2) a permanent injunction ordering the defendant to conduct any further competition for these requirements with BPAs "which impose enforceable obligations both on the United States Forest Service and on Awardees of the proffered [BPAs]; and
>
> (3) a declaration that Crewzers is entitled to equitable relief, and money damages, for the defendant's breach of an "implied-in-fact contract of good faith, fair dealing, and honest consideration" entered into between the Forest Service and Crewzers at the outset of this procurement process.

Am. Compl. at 28-29.

We then held a second status conference and scheduled further proceedings in the case. Pursuant to that schedule, the government filed an administrative record on December 28, 2010. We allowed a corrected administrative record to be filed on

- 6 -

January 7, 2011. On January 22, 2011, the plaintiff moved to supplement the administrative record with an electronic message issued by the Forest Service on January 20, 2011, during the pendency of the protest, in relation to the contested terms of the Solicitation. The government did not object to supplementation, but proposed to also include a letter sent to the plaintiff concerning the very matters addressed in the electronic email. The plaintiff acquiesced to the government's counter-proposal, and we subsequently allowed the proposed additions to the record.

The parties filed cross-motions for judgment on the administrative record in accordance with RCFC 52.1. Briefing was completed on February 28, 2011, and we heard oral argument on the cross-motions on March 11, 2011.

## DISCUSSION

I. **Applicable Legal Standards**

Pursuant to 28 U.S.C. § 1491(b)(1), the U.S. Court of Federal Claims possesses:

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement [,] ... without regard to whether suit is instituted before or after the contract is awarded.

*Id.*

In exercising our bid protest jurisdiction, we review a procuring agency's determinations under the standard set forth in the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A). *See* 28 U.S.C. § 1491(b)(4); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The standard of review under the APA is exceedingly narrow. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Accordingly, we may only set aside an action or decision of the agency if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)); *Fru-Con Constr. Co., Inc. v. United States*, 57 Fed. Cl. 483, 485 (2003). Our analysis considers whether: "(1) there was subjective bad faith on the part of procurement officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated." *Metric Sys. Corp. v. United States*, 42 Fed. Cl. 306, 310 (1998) (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974)).

In alleging error, the protestor must do more than identify circumstances where the agency made a mistake. When challenging a procurement decision as arbitrary and capricious, for example, the protestor must establish that such a mistake was so excessive as to fall outside the decision-maker's ambit of discretion. In other words, a protestor must demonstrate that there was no rational basis for the agency's determination. *Banknote Corp. of America v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni* , 238 F.3d at 1332-33)*; see also Baird Corp. v. United States*, 1 Cl. Ct. 662, 664 (1983).

When the protestor claims the agency's actions were not in accordance with law, it must establish a "clear and prejudicial violation of applicable statutes or regulations." *Banknote Corp.*, 365 F.3d at 1351*; Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000). In the typical post-award context, this burden is met with evidence demonstrating that "but for the error, [they] would have had a substantial chance of securing the contract." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (citations omitted); *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). However, in a pre-award protest such as the present case, in which the solicitation is challenged, the prospective bidder must establish only "a non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009) (adopting standard articulated in *WinStar Communications, Inc. v. United States*, 41 Fed. Cl. 748 (1998)).

The parties have filed cross-motions for judgment on the administrative record, pursuant to RCFC 52.1. The procedural posture of this case dictates that the Court resolve questions of fact by reference to the administrative record, as if the Court were conducting a paper trial on that record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1354-56 (Fed. Cir. 2005).

II. **Blanket Purchase Agreements (BPAs)**

Part 13 of the FAR establishes procedures for simplified acquisitions. Pertinent to the present case, section 13.303-1(a) of the FAR defines the BPA as "a simplified method of filling anticipated repetitive needs for supplies or services by establishing 'charge accounts' with qualified sources of supply." FAR § 13.303-1(a). These charge accounts are established as an administrative convenience with multiple vendors "so purchases can thereafter be made without having to issue individual purchase documents each time." *Mid-America Officials Ass'n*., 89-3 BCA ¶ 22,231 (1989); *see also* 2 GOVT CONTRACT AWARDS § 2:16 (Purpose of the BPA "is to reduce administrative costs, improve opportunities for small business concerns, to promote efficiency and economy in contracting, and to avoid undue burdens for agencies and contractors.")

The blanket purchase agreement is not a contract. *Mid-America Officials Ass'n*., 89-3 BCA ¶ 22,231 (1989). It is instead a collection of provisions that may mature into a contract between the government and a supplier if and when a purchase order – in

this case, a "resource order" -- is entered into by each. *See Potomac Computers Unlimited, Inc.*, 94-1 BCA ¶ 26,304 (1993); *Prod. Packaging*, 03-2 BCA ¶ 32,388 (2003).

### III. <u>Illusory Contract Argument</u>

Crewzers has cast the entire BPA scheme established by the Forest Service as an unlawful endeavor, insofar as the solicitation contains language of agreement which is both illusory and unenforceable. Am. Compl. ¶¶ 4. According to the plaintiff the procurement itself, therefore, "lacks a rational basis, and is unreasonable or irrational, and thus arbitrary and capricious." *Id.* at ¶ 5. Furthermore, complains Crewzers, the unenforceable, illusory promises in the challenged BPAs violate various procurement statutes and regulations because they fail to promote competition, efficiency and economy in contracting, frustrate the contracting officer's ability to arrive at price reasonableness determinations and result in a breach of the contracting officer's duty to treat offerors fairly. *See id.* at ¶¶ 5(c)-(g) (citing Competition in Contracting Act, 41 U.S.C. § 253 (g)(1) and FAR §§ 1.102(b)(3); 1.1.102-2(c)(3) and 13.106-3(a)).

The plaintiff's pleadings rely heavily on the case *Ridge Runnner Forestry v. Veneman*, 287 F.3d 1058 (Fed. Cir. 2002). That case involved so-called "tender agreements," entered into pursuant to a Request for Quotations (RFQ) between the Forest Service and Ridge Runner Forestry, a fire protection company that sought to lease equipment to the Forest Service in the event of a wildfire. Several clauses of the RFQ, incorporated into the agreements, were at issue there: (1) a statement that an award of a tender agreement "does not preclude the Government from using any agency or cooperator or local [Emergency Equipment Rental Agreement] resources;" (2) a statement that the award "does not guarantee there will be a need for the equipment offered nor does it guarantee orders will be placed against awarded agreements;" and (3) a provision which allowed the contractor to decline any agency-requested equipment rental for any reason. *Id.* at 1060. With respect to this last clause, "it [was] mutually agreed that, upon request of the government, the contractor shall furnish the equipment offered ... *to the extent the contractor is willing and able at the time of order.*" *Id.* (Emphasis supplied by opinion.)

It is important to note that the case is not a bid protest, nor does it involve pre-award activity. Instead Ridge Runner attempted to invoke the jurisdiction of the Department of Agriculture Board of Contract Appeals in order to challenge the fact that the vendor had been systematically excluded, not having been called upon pursuant to the tender agreement for four years running. *Id.* The question presented in that matter was whether there was, in fact, a contract needed to give the Board jurisdiction. The Board found that the tender agreement was not a valid contract. The Court of Appeals agreed, reasoning:

> To be valid and enforceable, a contract must have both consideration to ensure mutuality of obligation ... and sufficient definiteness so as to "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Ace Federal Reporters, Inc. v. Barram*, 226 F.3d

- 9 -

>1329, 1332 (Fed. Cir. 2000) (internal citations omitted.) "To constitute consideration, a performance or a return promise must be bargained for." RESTATEMENT (SECOND) OF CONTRACTS § 71 (1) (1979). And the "promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances...." *Id.* § 71 .

*Ridge Runner*, 287 F.3d at 1061. As the Court of Appeals observed, "[t]he government had the option of attempting to obtain firefighting services from Ridge Runner or any other source, regardless of whether that source had signed a tender agreement." *Id.* Likewise, the agreement "placed no obligation upon Ridge Runner ... If the government came calling, Ridge Runner 'promised' to provide the requested equipment only if it was 'willing and able.'" *Id.* at 1062. "It is axiomatic," reasoned the Court, "that a valid contract cannot be based upon the illusory promise of one party, much less illusory promises of both parties." *Id.* (citations omitted).

It is well established that a contract is not formed under these circumstances. As the Federal Circuit has held, "a route of complete escape vitiates any other consideration furnished and is incompatible with the existence of a contract." *Torncello v. United States*, 681 F.2d 756, 769 (Fed. Cir. 1982). While Crewzers has challenged both the illusory nature of the Forest Service's obligations and those of the suppliers under the proposed BPA, the plaintiff's primary criticism of this solicitation has focused on the company's own "route of complete escape."

First, Crewzers argues that under FAR 13.303-3(a)(1), awardees of BPAs are *required* to accept orders placed against the BPAs. Consequently, the "willing and able" language of the solicitation transmutes what is intended to be a binding obligation into an illusory promise. Plaintiff's Brief in Support of Plaintiff's Motion for Judgment on the Administrative Record (Pl. Br.) at 29-30. Second, according to the plaintiff, the proffered BPAs are illusory and unenforceable because they "unlawfully reserve for the United States Forest Service Contracting Officer a choice of alternative performances," including: the right to rely on agency cooperators; the ability to discard the dispatch priority ranking in favor of the "closest forces" concept in cases of "initial attack;" and the right to modify rankings and ordering procedures. *See id.* at 30-32 (citing *Ridge Runner*, 287 F.3d at 1061 and AR 15-16).

The plaintiff's arguments must fail where, as here, the alleged illusory promises are not – and do not purport to be – part of a binding agreement giving the plaintiff exclusive contractual rights. The chosen procurement vehicle is, by definition, *not* a contract. *See Zhengxing v. United States*, 71 Fed. Cl. 732, 738, (2006) (Holding there was no factual or legal predicate establishing jurisdiction under the Contract Disputes Act ("CDA"), 41 U.S.C. § 609, because BPA is not a contract), *aff'd,* 204 Fed. Appx. 885, 2006 WL 3228605 (Fed. Cir. Nov. 8, 2006); *Mid-America Officials Ass'n.*, 89-3 BCA ¶ 22,231 (1989) ("[T]he issuance of a BPA to appellant was not a promise or representation that needs for officiating services would be purchased only from appellant during the term of the BPA.")

With the *Ridge Runner* case, Crewzers establishes no more than the fact that nearly identical terms in an earlier iteration of the Forest Service's agreement were likewise not binding upon the parties entering into them. We note that *Ridge Runner*, like other cases cited by the parties, does not actually involve a formal BPA, a distinction without a difference for the purposes of this discussion. *See Modern Sys. Tech. Corp. v. United States*, 24 Cl. Ct. 360 (1991) ("Basic pricing agreements" held not binding on parties), *opinion adopted,* 979 F.2d 200 (Fed. Cir. 1992); *Zhengxing*, 71 Fed. Cl. at 738 n.19 (analogizing blanket purchase agreements and basic pricing agreements). In any event, the government embraces the Federal Circuit's holding that these types of agreements are not meant to bind either party.

We agree. In the typical case, the BPA is "merely a framework for future contracts and *only* creates a contractual obligation with regard to *accepted* orders." *Zhengxing v. United States*, 204 Fed. Appx. 885, 886-87, 2006 WL 3228605 (Fed. Cir. Nov. 8, 2006) (Emphasis added). We concur with Crewzers' own assessment that this BPA contains illusory rights and responsibilities. It is meant to do no more. Future terms are spelled out, but performance is not guaranteed. The BPA, therefore, "lacks the mutual intent to form a binding contract." *See id.* (citing *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202-04 (Fed. Cir. 1992)); *see also Cardiometrix*, 94-1 BCA ¶ 26269 (1993) (Blanket purchase agreement "lacks an ingredient that is essential for the formation of a contract, namely, mutual consideration.")

Indeed, the FAR goes so far as to set forth mandatory terms and conditions for a BPA, which make it abundantly clear that the BPA carries no guarantee of performance. Notable among these is the requirement to include "[a] statement that the supplier shall furnish supplies or services, described in general terms, *if and when requested by the contracting officer* ... during a specified period and within a stipulated aggregate amount, if any. FAR § 13.303-3(a)(1) (Emphasis added). In that same vein, the FAR provides that the BPA must state "that the Government is obligated *only to the extent* of authorized *purchases actually made under the BPA*." *Id.* at § 13.303-3(a)(2) (Emphasis added).

Given all of these authorities supporting the government's chosen procurement method, we strained to understand the plaintiff's objections to the BPA. In its simplest terms, Crewzers now argues that to be a valid BPA under the FAR, the agreement is binding on the party supplying the service, but not upon the government. In making this argument, plaintiff selectively ignores its earlier contrary position that the Forest Service is bound to seek its resources from among BPA-holder resources, and may not reserve the right to use agency cooperators.

The language of the FAR upon which the plaintiff relies for its premise -- "the supplier *shall* furnish supplies or services, described in general terms, if and when requested by the contracting officer" -- is plucked out of context from a section of the regulation governing the level of detail required in describing the items to be furnished in the event a purchase order is made against the BPA. *See* FAR 13.303-3(a)(1). Read in light of the entire passage, which sets forth a menu of items and formats to be used in preparing a BPA, this provision contemplates that a purchase order has been

entered into by the parties.  It is not, as the plaintiff suggests, based on its parsed reading of FAR 13.303-3(a)(1), a clause making acceptance of *all* purchase orders mandatory on the part of the supplier.

In fact, it is universally understood – among courts, various boards of contract appeals and noted authorities in the field of procurement law – that a BPA obligates neither party until such time as an individual purchase order is issued by the government and accepted by the contractor.  *See e.g., Potomac Computers*, 94-1 BCA ¶ 26,304 (1993) (Recognizing that vendor could refuse to accept call for services); *Julian Freeman*, 94-3 BCA ¶ 27280 (1994) ("Under a BPA, neither party actually commits itself nor assumes any duty toward the other."); *BPAs vs. IDIQs: An Interesting Choice*, 24 NASH & CIBINIC REPORT ¶ 26 (In broader discussion of pros and cons of BPAs commentator notes: "Of course, using this technique means that the contractor is not contractually bound but that is of little concern to an agency when there are multiple contractors capable of performing the work.")

As this Court has recognized, in the context of a failed attempt to invoke the CDA with a BPA, only *accepted* orders create contractual obligations.  *See Zhengxing*, 71 Fed. Cl. at 738, n.21 (distinguishing umbrella BPA from individual purchase order "which can give rise to a contract."); *see also* FAR § 13.302-3 (a) ("When it is desired to consummate a binding contract between the parties before the contractor undertakes performance, the contracting officer shall require written acceptance of the purchase order by the contractor.")  Accordingly, to the extent Crewzers contends that a BPA is valid only if it imposes a unilateral obligation to perform on the supplier, we reject this plank of the plaintiff's argument.  There is simply no precedent favoring the view that a BPA is a contract which binds one party and not the other.  As *Ridge Runner*, *Modern Systems Technology*, *Zhengxing*, and many other decisions before them have held, there is no mutuality of consideration in such a case.  *See Zhengxing v. United States*, 204 Fed. Appx. 885, 886-87, 2006 WL 3228605 (Fed. Cir. Nov. 8, 2006) (citing *Modern Sys.*, 979 F.2d at 202-04).  Crewzers has conceded as much.

### IV.     Newly Raised "Option Contract" Argument

Crewzers contends, late in the briefing cycle, that the Forest Service's BPAs are akin to option contracts, which can be accepted by Crewzers' partial performance over a period of time without further intervention on the part of the government.  *See* Plaintiff's Reply Brief in Opposition to Defendant's Cross-Motion for Judgment on the Administrative Record ("Pl. Opp.") at 1-8.

Our consideration of this case has been frustrated in large part by the changing landscape of plaintiff's theories.  The plaintiff has progressed from its reliance on *Ridge Runner* and the insistence that the government must be bound to its promises, to an apparent concession that the Forest Service is not required to commit to use the plaintiff's resources when the agreement is formed.  *See* Discussion, para. III.  For the very first time in this case, the Table of Contents of plaintiff's reply brief includes an entirely different claim:  "These Proferred (sic) Multiple Preseason Incident Blanket Purchase Agreements Are Option Contracts Enforceable Because They Induce Actions

Of A Substantial Character." Plaintiff's Reply Brief in Opposition to Defendant's Cross-Motion for Judgment on the Administrative Record (Pl. Reply) at ii.

This amalgamation of plaintiff's theories is waived by counsel's failure to articulate the argument in either of its complaints or in its main brief. The Court requires parties to abide by its Special Procedures Order, which provides that "[a] moving party's reply brief is limited to responding to matters contained in the other party's opposition brief." Special Procedures Order ¶ 9. As counsel was made aware, he must request leave of Court to advance new arguments in reply briefs, and such requests are disfavored. *Id.* When questioned about his tactics at oral argument, counsel for plaintiff conceded that he was in violation of the Court's Special Procedures Order. Oral Arg. at 10:31-10:33. He explained that he came up with the option contract argument because he was dissatisfied with his original argument and could not find cases in support of his position. Oral Arg. at 10:30-10:31.

These newly minted theories would have made no difference in our result. The plaintiff reasons that the BPAs implicated in this procurement may actually be characterized as option contracts. This is because the requirements associated with becoming a valid BPA holder induce actions of a substantial character on the part of the offeror, in particular the perceived requirement to set aside a dedicated vehicle in the host dispatch zone. Pl. Opp. at 4-5. At the oral argument, counsel for plaintiff articulated his client's substantial or partial performance and further expounded on his novel theory of how this procurement should operate. Crewzers, or any other supplier with a BPA for that matter, "performs" the purported contract when it provides the information concerning its vehicles (VIN, license number, make and year, and Department of Transportation inspection date) on the form in the VIPR system, *see* AR 5, hires and trains an operator, and drives the bus to the host dispatch center – or at least in the vicinity of that center – to "wait for a phone call" in the event of wildfire or all-hazard incident. Oral Arg. at 10:37-10:38; 11:37-11:40. According to the plaintiff, these actions constitute partial performance and, thereby, form a binding contract subjecting the supplier to potential breach in the event it fails to provide the identified crew carrier bus upon request by the Forest Service. The government follows through on its reciprocal contractual obligations as soon as it places an order from a supplier in accordance with the established DPL. Oral Arg. at 10:44-10:45.

The plaintiff has had longstanding objections to the requirement that it dedicate a vehicle to a specific host dispatch zone. It has tailored them to fit its new theory that the solicitation calls not for BPAs, but option contracts. The latter presumably imposed obligations upon the Forest Service once Crewzers mobilized its resources in response to the RFQ. Among the cases cited by the plaintiff is *Wesleyan Co. v. Harvey*, 454 F.3d 1375, 1378-79 (Fed Cir. 2006), a case in which the Court of Appeals ruled that certain purchase orders were procurement contracts because they involved "the exchange of money." *Id.* at 1378. Crewzers' option contract analogy, and its reliance on this case, is unavailing. The BPAs here *may* result in a purchase order, but until that time in which the transportation services are actually required and an agreement based upon prearranged prices is struck, neither the Forest Service nor the contractors is obligated to perform the transportation services contemplated under the BPA. Unlike the

agreement at issue in *Wesleyan*, no funds are committed unless and until an order is placed against a BPA. *Compare* FAR § 13.303-3 (BPA preparation instructs omitting accounting and appropriation data.) *and* FAR § 13.303-5 (In making purchases under BPAs "cite the pertinent purchase requisitions and the accounting and appropriation data.")

Crewzers also relied upon *Schism v. United States*, 316 F.3d 1259, 1304 (Fed. Cir. 2002) in support of the argument that partial performance by the party seeking a BPA with the agency creates a binding contract and, therefore, establishes an option contract scenario. In the *Schism* case, the Federal Circuit concluded that an enlistment contract held the promise of military benefits, which became binding when the potential service member accepted the enlistment contract. There is no parallel to the Forest Service's solicitation – or to the characteristics of a BPA, as described in the FAR -- which may or may not result in purchase orders by the government. *See* FAR 13.302-1 (Addressing purchase orders, generally); FAR 13.004 ("[I]ssuance by the Government of an order in response to a supplier's quotation does not establish a contract ... A contract is established when the supplier accepts the offer.")

There is no support in the administrative record that the parties intended to enter into an option contract. Nor does the administrative record evidence any intent to settle on a requirements contract of the sort involved in *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000). *See Ridge Runner*, 287 F.3d at 1061 (Distinguishing the tender agreements involved from requirements contracts). To the contrary, the solicitation was clear and unambiguous in its statement that "[d]ue to the sporadic occurrence of incident activity, the placement of any orders IS NOT GUARANTEED." AR 6 (Emphasis in original). It is clear from the record that the BPA was specifically desired by the agency in lieu of a binding contract. See *Potomac Computers*, 94-1 BCA ¶ 26,304 (1993) ("That a blanket purchase agreement, rather than a firm contract, was intended was clear from the terms of the solicitation and its recurring use of that term – 'blanket purchase agreement.'").

### V. **Contracting Officer Determinations**

Crewzers vaguely argues that the solicitation should be set aside for its violation of various FAR requirements, unrelated to those addressed above. For instance, the plaintiff contends that the illusory characteristics of the resulting agreements will necessarily render the contracting officer's price reasonableness and responsibility determinations irrational. The entire basis for this challenge lies in the assumption that the offerors cannot be held to their end of the bargain if they are required to perform under the stated qualifications and prices only if they are "willing and able" at the time of the purchase order. We reject these contentions as merely fly-specking the solicitation.

### VI. **Cooperative Agreements**

Finally, Crewzers argues that the Forest Service's solicitation violates a statutory preference for the use of local private contractors in responding to all-hazard incidents, established by the Robert T. Stafford Disaster Relief and Emergency Assistance Act,

- 14 -

42 U.S.C. § 5150 (a)(1) ("Stafford Act"). Alternatively, Crewzers contends that the use of local governmental entities via cooperative agreements results in an improper non-competitive procurement contract in violation of the Federal Grant and Cooperative Agreement Act, 31 U.S.C. § 6303(1). Pl. Br. at 32-35. We review each of these authorities briefly.

First, the Stafford Act provides, in pertinent part:

> In the expenditure of Federal funds for debris clearance, distribution of supplies, reconstruction, and other major disaster or emergency assistance activities which *may be carried out by contract or agreement* with private organizations, firms, or individuals, preference shall be given, *to the extent feasible and practicable*, to those organizations, firms and individuals residing or doing business primarily in the area affected by such major disaster or emergency.

42 U.S.C. § 5150 (a)(1) (Emphasis added). Substantially the same language appears in the FAR, which requires the defendant to apply the Stafford Act preference "when awarding emergency response contracts," either through a local area set aside or as an evaluation preference. FAR § 26.202.

Crewzers argues that the solicitation -- in particular, the provision that reads "[t]This Agreement does not preclude the Government from using any Agency or Agency Cooperator owned resources before resources are mobilized under this Agreement." – violates the statutory preference. See Solicitation, §D.6 ("Ordering Protocol for Resources.")

Turning to the Federal Grant and Cooperative Agreement Act, that authority states:

> An executive agency shall use a procurement contract as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when –
>
> (1) the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; or
>
> (2) the agency decides in a specific instance that the use of a procurement contract is appropriate.

31 U.S.C. § 6303.

The plaintiff contends that this statute is violated because the solicitation expressly permits the Forest Service to use crew carrier buses from potential local agency sources, outside the reach of the BPA, presumably relying upon pre-existing

- 15 -

cooperative agreements as opposed to contracts entered into using competitive acquisition procedures. Pl. Br. at 34-35.

According to Crewzers, the Interagency Agreement for Wildland Fire Management ("Interagency Agreement"), an agreement entered into by various agencies in both the Department of Interior and Department of Agriculture, "explains that the statutory authority" of the Forest Service and of other agencies to respond to all-hazard incidents "is given in the [Stafford Act]." Pl. Br. at 20. But the Interagency Agreement contains no such explanation nor does it purport to limit the authority of governmental entities to join forces in their response to fires or all-hazard incidents. The statute is mentioned only once under the "Objective" caption of the agreement. *See* Interagency Agreement, ¶ III (A) ("To provide a basis for cooperation among the agencies on all aspects of wildland fire management, and in all-hazard emergency support function activities as requested and authorized under the [Stafford Act]."); AR 421.

As the defendant noted in its response to plaintiff's motion, there are numerous authorities permitting cooperation among Federal agencies for fire protection, in general. Defendant's Motion for Judgment Upon the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record (Def. Br.) at 17 (citing Reciprocal Fire Protection Act, 42 U.S.C. §1856a and Timber Protection Act,16 U.S.C. § 594). Interagency agreements of this type signal an effort on the part of responsible agencies "to achieve more productive, cost effective and efficient operations among these partnering agencies." AR 420. Crewzers does not seriously dispute that the Forest Service may partner with other Federal agencies in responding to fires and all-hazard incidents without violating the law. The plaintiff's challenge is aimed more directly at the use of "agency cooperators," defined as "[l]ocal Government entities available through agreement to assist the Federal and State Government agencies." AR 27.

We find the disclaimer in the ordering protocol, which explicitly acknowledges that interagency agency cooperative agreements might be relied upon in lieu, particularly during "initial attack," complies with applicable procurement law. According to the plaintiff, the defendant may not carve out this broad exception because it turns the Stafford Act preference on its head. We reject this argument.

We do not interpret the Stafford Act to establish a preference for local private vendors vis á vis local governmental entities or agency cooperators. Rather, the statute was intended to promote the use of *local* contractors over *non-local* contractors. *See* 42 U.S.C. § 5150(a)(1) ("In the expenditure of Federal funds for ... and other major disaster or emergency assistance activities which *may be carried out by contract or agreement* with private organizations, firms, or individuals,...".) When it reaches out to agency cooperators, the government is not contracting but rather coordinating resources as part of a unified response to an all-hazard incident.

For this same reason, we disagree with the plaintiff on the applicability of the Federal Grant and Cooperative Agreement Act.  The policy reflected in the solicitation merely recognizes that in certain situations it is not advisable to limit in advance the Forest Service's response options.  Furthermore, the existence and parameters of any cooperative agreement between the Forest Service and an agency cooperator for the purchase, lease or barter of carrier crew buses, is purely conjectural at this juncture.  If and when the government enters into such an arrangement, the plaintiffs may seek any remedies available to it.  On the current record, however, there is no violation of the statute.

## **CONCLUSION**

The plaintiff's entire protest is built on the faulty assumption that in order to withstand scrutiny under our standards of administrative review, the Forest Service's BPA must possess the qualities of a binding contract.  We reject this assumption.

The Court, therefore, finds in favor of the government.  The defendant's cross-motion for judgment on the administrative record is hereby **GRANTED**.  The plaintiff's motion for judgment on the administrative record is hereby **DENIED**, as are its requests for permanent injunction and bid preparation and proposal costs.

The Clerk of the Court is directed to enter judgment in favor of the defendant.  Each party is to bear its own costs of litigation.

**IT IS SO ORDERED.**

                              s/ Lawrence M. Baskir
                              LAWRENCE M. BASKIR
                                     Judge